UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MARIA GUADALUPE REYES GAONA,<br>TOMAS TORRES CURIEL,<br>ANDRES PONCE QUINTERO,<br>JORGE BECERRA ORTIZ,<br>FRANCISCO CARBAJAL,<br>MARCOS JOSE BARBOZA VALLENILLA,<br><br>    Petitioners,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, CUSTOMS AND BORDER<br>PROTECTION, IMMIGRATION AND<br>CUSTOMS ENFORCEMENT, WILLIAM P.<br>BARR, *Attorney General of the*<br>*United States*, CHAD F. WOLF,<br>*Acting Secretary of the U.S.*<br>*DHS*, DANIEL BIBLE, *ICE Field*<br>*Office Director*, RAYMOND<br>CASTRO, *Warden, South Texas*<br>*Detention Center, GEO Group*<br>*Inc.*, SR. WARDEN ORLANDO PEREZ,<br>MATTHEW T. ALBENCE,<br><br>    Respondents. | Docket No. 5:20-cv-00473-FB<br><br>San Antonio, Texas<br>September 1, 2020 |

TRANSCRIPT OF MOTION HEARING (BY PHONE)
BEFORE THE HONORABLE RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

FOR THE PETITIONERS:
Curtis F. Doebbler
RAICES
802 Kentucky Avenue
San Antonio, TX 78201

Bashir Ghazialam
Law Offices of Bashir Ghazialam
P.O. Box 928167
San Diego, CA 92192

```
 1   FOR THE RESPONDENTS:
     Matthew M. Mueller
 2   U.S. Attorney's Office
     601 NW Loop 410, Suite 600
 3   San Antonio, TX 78216

 4   COURT RECORDER:  FTR Gold

 5   Proceedings reported by electronic sound recording.  Transcript
     produced by computer-aided transcription.
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    *(9:49 a.m.)*

2         THE COURT:  All right.  So next up before the Court,

3    set for an evidentiary hearing, is -- on a preliminary

4    injunction, is case number SA:20-CV-00473-FB, Gaona, et al,

5    versus U.S. Department of Homeland Security, et al.

6       And then, counsel, would you please introduce yourselves

7    for the record.

8         MR. MUELLER:  Matthew Mueller on behalf of

9    respondents.

10         MR. DOEBBLER:  Curtis Doebbler on behalf of

11    petitioners.

12         MR. GHAZIALAM:  Good morning, Your Honor.  Bashir

13    Ghazialam on behalf of petitioners.

14         THE COURT:  All right.  Good morning to you all.

15       Thanks again for the excellent briefing.  I've been through

16    it.  I reread pretty much everything in the case last night and

17    this morning.  I'm aware of the -- of the sort of discovery

18    issue that's arisen.  And that's probably a pretty good place

19    to start.  That really is going to, I think, overlap and

20    involve some of the other issues in the case and, in

21    particular, the pending motion to dismiss, given that, if there

22    is discovery that's needed in order to inform the Court's

23    jurisdiction, then, you know, it's appropriate to take it up.

24    On the other hand, if it turns out that, even assuming things

25    go a certain way during discovery, if there still can't be

1  jurisdiction, then, you know, that may inform things as well.

2  So we'll take up those -- that issue of discovery here at this

3  hearing first, before we move on to anything else.

4      I think that probably, though, the best place to start,

5  Mr. Doebbler, is with you just before we really dig into the

6  meat of this -- is just -- if I could, just get an update from

7  you on petitioners' status -- statuses with respect to health

8  concerns.  And also my understanding is, we've had at least one

9  other removal or deportation in the case, and I think there was

10  a prior one as well.

11      So if you could just let me know what everybody's status is

12  here at the start, that'll be helpful for the Court.

13         MR. DOEBBLER:  Yes.  Good morning, Your Honor.

14      We have six petitioners in this matter.  Five of them were

15  at Pearsall.  We [inaudible] one here recently [inaudible] left

16  the country.  And it's unclear whether he took -- well, he was

17  actually [inaudible] voluntary departure and whether he was

18  deported.  It was after he certainly was leaving the country

19  and in custody [inaudible] at the time this matter was filed

20  [inaudible] time that the [inaudible] that the TRO was filed.

21      Another one of respondents -- the lead respondent, Maria

22  Guadalupe Reyes Gaona, she has also left the country.  Again,

23  I'm not sure [inaudible] call and verify [inaudible]

24  immigration lawyer.  I'm not sure what the reason was for that

25  [inaudible] deportation [inaudible] voluntary departure.

1    And the first one I mentioned is Andres Ponce Quintero.

2  And Andres Ponce Quintero and Maria Guadalupe Reyes Gaona are

3  no longer in the country but were here when the petition was

4  filed.  And [inaudible] other cases that [inaudible]

5  jurisdiction [inaudible] nevertheless, the country [inaudible]

6  filed.

7    And the other four respondents are in the country, still in

8  detention in Pearsall, in the state detention center, the South

9  Texas Detention Center —— and Tomas Torres Curiel, Francisco

10 Carbajal, Marcos Jose Barboza Vallenilla and Jorge Becerra

11 Ortiz.  And as we notified the Court, Marcos Vallenilla had

12 contracted COVID-19, and we agree he's still alive.  We don't

13 know very much about his condition except that he's been put

14 into solitary confinement.  But we don't know whether that

15 consists of treatment [inaudible] confinement.

16    And he is only —— he was very vulnerable.  He has HIV/AIDS,

17 and he is, because of that [inaudible] both parties are aware,

18 it is one of the vulnerabilities that the CDC lists as

19 vulnerabilities.  And we don't know how he is being treated.

20    Unfortunately, I can't give you a lot of updates on the

21 others except for the brief phonecall that their immigration

22 attorney had with them, one of our attorneys at RAICES, and he

23 indicated that there were —— he talked with Tomas and Jorge.

24 And he indicated that there have been no change [inaudible]

25 communicated [inaudible] told him that there had been 14 or so

individuals transferred into the detention center.  Four of them said they had tested positive for COVID-19, and they hopefully did not have it when they were transferred in.  They indicated they were -- had been tested positive.  And all 14 indicated [inaudible] in the detention center, that they are now [inaudible] additional [inaudible].

And Tomas also indicated to us that there are several areas of the detention center that are completely vacant, and there are rooms that are not being used, dormitories that are not being used.  When these 20 people came in, they're integrated into the three or so dormitories that are being used [inaudible].

THE COURT:  Okay.  And, Mr. Mueller, do you have any additional information that you can share about the individual petitioners and their circumstances?

MR. MUELLER:  Yes.  So Mr. Quintero was removed.  I don't know exactly the circumstances.  He was removed on July 10th, prior to the TRO being filed in the case, after [inaudible].  And that's -- his removal document is docket 32-1 on the PACER.

Gaona was removed a little over ten days ago.  I spoke to her immigration attorney before she left.  And he made the decision that he was going to withdraw her claims for asylum and [inaudible] removal since she went through all of her immigration claims that were [inaudible].  That was, I believe,

1   on Friday [inaudible].  And I apologize.  The immigration

2   document I meant to file as an exhibit on Friday and

3   [inaudible].

4          THE COURT:  Okay.

5          MR. MUELLER:  And then also, Mr. Vallenilla, who has

6   previously again contracted COVID-19, he has been treated -- is

7   being treated [inaudible] as the medical records show that I

8   produced to both the Court and opposing counsel.  He was being

9   treated and his position in terms of in an individual cell is

10  as a result of that treatment -- received the treatment.  And

11  I've been told -- I haven't received an update in the last few

12  days.  [Inaudible] was not going to be -- his treatment was

13  going well.  He had no symptoms as of the last update I

14  received, and he was going to be moved out once he tested

15  negative.

16         THE COURT:  Okay.  So, as of now, he's asymptomatic or

17  largely asymptomatic but under quarantine/solitary?

18         MR. MUELLER:  Yeah.  The last update that I had.  And

19  I can get another update [inaudible].

20         THE COURT:  Okay.  And then how many -- do we know how

21  many cases we have at Pearsall?

22         MR. MUELLER:  I have not received an update since the

23  declaration that I filed.

24         MR. DOEBBLER:  And I think ICE has reported, if I'm

25  not mistaken, 169 cases as of yesterday.  [Inaudible] an

1 increase from [inaudible] petition was filed -- when the

2 original petition was filed and back when the TRO was filed.

3        THE COURT:  Okay.  And how many total detainees?  Do

4 you know?

5        MR. MUELLER:  I do not know the total detainees.  I

6 know that they've been [inaudible] percent capacity.

7        THE COURT:  Okay.  So, I mean, the next thing to do

8 is to -- I think is to try to figure out whether and to what

9 extent discovery is appropriate.  I think we can start there.

10     So, Mr. Doebbler, why don't you just outline -- and I know

11 you've done this in your motion.  And, as I said, I've been

12 through it.  So you can assume that when you're -- when you're

13 discussing it.  Just outline your discovery requests and

14 explain, you know, how you're -- how you're entitled to that

15 discovery here.

16     And also, I mean, I guess before we do that, given that you

17 have outstanding discovery requests, which I'm assuming would

18 inform your -- not only your claims -- ultimate claims but your

19 claims as they go to getting injunctive relief on -- you know,

20 early on in the case, whether it's the earlier TRO requests or

21 now at a preliminary injunction.  Do you -- are you asking for

22 more time to get the discovery before we get into the merits?

23 Are you comfortable sort of talking about the merits?  How do

24 you -- how would you envision that we ought to proceed

25 procedurally with, you know, all of the motions and the issues

that are pending before the Court today?

        MR. DOEBBLER: Thank you, Your Honor.

As you know, we raised this initially in a motion for temporary restraining order. And we deem this to be an urgent matter. And we believe that before the Court there is enough information to issue a preliminary injunction. And, of course, that does not prejudice the final adjudication of the underlying habeas application. We hope that perhaps the Court would go forward in that way and that the discovery would be more related to a habeas and if the Court deems that there is sufficient information on the record, which petitioner obviously believes, to issue a preliminary injunction.

        THE COURT: Okay. Very good. So that -- I mean, that tells me that you feel comfortable proceeding today with the requested injunctive relief based on what we have so far. And I guess we can play it by ear. If it looks like, as we move through this, that we need more information, we can kind of address that as we go.

So maybe that means we can just kind of put a pin in the -- in the discovery because that kind of tees up the motion to dismiss then -- if, you know, under the appropriate standard for viewing the pleadings, if we -- if there isn't jurisdiction, as the government has asserted, or if you haven't stated a claim on which relief can be granted, then that would sort of end the inquiry into the other stuff.

So why don't I -- why don't I flip over to Mr. Mueller and let him just briefly tee up for us the questions that are brought up by the motion to dismiss. We'd previously discussed some of the claims, how they're framed. It's probably appropriate to just sort of do it fresh again, Mr. Mueller. I'll probably end up focusing largely in the same place I did last time, but I may not. So let's just go ahead and do that. And I'll give you a chance to sort of outline your case and then Mr. Doebbler an opportunity to mention his responses. And if at that time it's appropriate to hear from witnesses, we can, or we can kind of see how it goes.

Why don't you go ahead, Mr. Mueller.

MR. MUELLER: Thank you, Your Honor.

So, fundamentally, as 19 other district courts in the Fifth Circuit have held, this is a conditions of confinement case, which is not [inaudible]. Habeas can only grant relief if that is for release. They can only grant release from unlawful imprisonment [inaudible].

THE COURT: Is it ever appropriate in habeas to grant something less than release? So say if you have a habeas -- and, in particular, I mean, a 2241 context; right? You have somebody who's filed a habeas petition, but what they want is, you know, additional procedures or an opportunity for more process. Can you ever grant that relief in habeas, or is it sort of a binary release or deny -- deny any and all relief?

1      MR. MUELLER:  I think there may be some place in
2  habeas where you can do more procedure.  But most of our habeas
3  is a release request, and it's not pertaining to how they're
4  being held, and it's not to transfer to a different facility.
5  It is for release.
6      And so allegations that are -- that deal with the rules,
7  customs or procedures or threatening conditions of confinement
8  are properly brought as civil rights actions, not as habeas
9  actions.  And that -- the Southern District of Texas in *Eyayu*
10 *v. Wolf*, one of the recent cases decided October 14th, said
11 that [inaudible] case, and the Fifth Circuit [inaudible].
12     And there's -- a case looking at the legal authority to
13 detain the petitioners.  [Inaudible] they didn't do that.  They
14 haven't found that in their petition.  And petitioner
15 [inaudible] release and removed from the country.  We go into
16 [inaudible] the link [inaudible].  And so that issue was no
17 longer [inaudible].  A challenge to the length of the detention
18 I think is an area where procedural due process, if it may come
19 up, that could be raised for something other than release.  And
20 in that case it would be another bond hearing.  I've seen some
21 decisions perhaps where a habeas decision challenging the
22 length of detention, another bond hearing was [inaudible] with
23 an immigration judge.  And that was for detention that exceeded
24 two years in that case that I saw.  And another one in
25 detention that exceeded 30 months, which is not the case for

1  any of the remaining four.

2      And so it's not available to -- aid is not available to

3  review questions unrelated to the cause of detention.  And that

4  causes the legal authority to [inaudible].  And the

5  jurisdiction of the writ is confined to examination of the

6  record with a view, determining whether the person's restraint

7  of liberty [inaudible] relief [inaudible].

8      And so another recent case, *S.R.-Barr*, which was decided

9  just August 26th in the Northern District, quoting the Fifth

10  Circuit, [inaudible] person [inaudible] convicted to

11  confinement or prison procedures with a civil rights action in

12  determination in a prisoner's favor, not automatically

13  resulting [inaudible].  I think that's one of the issues here

14  in the conditions of confinement claim is the convictions -- at

15  what point did they result in release?

16      And just as ruling in favor of a procedural violation as to

17  a civil rights action would not necessarily result in release,

18  something that results in release and a common utilization for

19  habeas is a calculation of length of offense or legal authority

20  to hold, and Speedy Trial Act would come into play.  Those are

21  conditional habeas corpus [inaudible].

22      And as Judge Rodriguez asserted just over a year and a half

23  ago, claims asserting a [inaudible] while in custody renders

24  the custody illegal, fall outside the [inaudible].

25      And that's exactly what we have here.  The petitioners are

arguing that the way they're being treated in custody renders
that custody illegal.  And that is a civil rights action that
can be brought under *Bivens*, obviously 1983 [inaudible], and
that could be brought under [inaudible].

So, fundamentally, the conditions that create injury,
illness or the risk of death, as the Fifth Circuit has said and
repeated in a number of cases, those do not warrant release.

THE COURT:  Okay.  So let me shift to Mr. Doebbler
just for a response on that point.

So, Mr. Doebbler, is it -- is it -- well, I know you're
going to think it's not fair to [inaudible].  So Mr. Mueller is
characterizing all the claims in this case as challenging
convictions of confinement.  I understand, obviously, you
disagree with that.

Can you articulate for me, with respect to each of your
claims asserted in the amended petition, how they're not
challenging conditions of confinement?  What's your -- what's
your theory for these claims?  And you can -- you can go
through, kind of methodically if you want, you know, each one.

MR. DOEBBLER:  Thank you, Your Honor.

Well, as, you know, our [inaudible] claim is a challenge to
the substantive due process violations of petitioners' rights.
And we claim in that instance that the pervasive policies and
practices of the respondents are causing irreparable harm to
the petitioner, and those cannot be changed by trying to remedy

conditions. Those can only be remedied by a release of
petitioner. Perhaps over time they can change their policies
and practices. It's certainly not designed to protect the
petitioners. So --

THE COURT: Okay. But that's an -- that's an
important point, Mr. Doebbler. So let me make sure. You're
requesting release and nothing less for each of the remaining
petitioners; is that right?

MR. DOEBBLER: That's correct. We believe release is
the only appropriate remedy for each one of these petitioners.

THE COURT: Okay. And so -- all right. Okay. So
carry on now. So we're just kind of going through and
understanding your -- how you frame these claims and explain
how they're not conditions of confinement claims. So please
carry on.

MR. DOEBBLER: Thank you.

Well, the Fifth Amendment substantive due process claim is
based very much on [inaudible], which is a claim where the
Supreme Court found that civil detainees may not be detained in
a punitive manner. These are civil detainees. These are not
detainees that have committed any crime or even [inaudible]
tried for a crime. They are civil detainees, not even pretrial
detainees. They are people that are being held for the sole
purpose of ensuring that they appear for their immigration
hearings.

And the Supreme Court has long held, going all the way back to the early cases [inaudible] point to in our pleadings, not so long ago, but where the Supreme Court has reiterated a long-standing belief that you cannot hold civil detainees in a punitive manner.

I think here the real discussion is whether or not this is punitive. And I believe respondents argue that it's not punitive because they are conditions that can be changed. It's our view that these conditions [inaudible] been in place during the whole time of this pandemic, but, more importantly, conditions might be evidence of pervasive practices and policies. And policies and practices that cause irreparable harm to the petitioner are sufficient to qualify as a punitive detention of those individuals. And in those instances we believe then release to be the appropriate remedy.

And we also believe that these punitive actions taken by the government, again under the Fifth Amendment substantive due process claim, are not related to a legitimate government purpose because, although the government may have a purpose to detain people -- we admit that. They can detain people to ensure that they turn up for their immigration hearings -- they cannot do that when the detention causes a threat to the health or life of those individuals. So we believe that it is definitely not proportional to the government's interest.

And I can elaborate more, but that is the thrust of our

1  substantive due process claim.  And we have a procedural due
2  process claim that I will deal with together with the first
3  claim, Administrative Procedure Act claim, based on the
4  arbitrary and capricious standard and the Fifth Amendment
5  procedural due process as well as the Administrative Procedure
6  Act [inaudible] -- I'm sorry -- and arbitrary, capricious
7  standard.
8     That is based on the fact that these petitioners have asked
9  for release on the grounds that I just mentioned.  They have
10 said that their detention is illegal because it is cumulative.
11 And they said it's punitive because of the threat that COVID-19
12 poses and the inability, because of the policies and practices,
13 of the respondent to be able to protect them.  They have either
14 received no response or very cursory response, even as we made
15 [inaudible] in our discovery requests.  We requested from
16 respondents the evidence on which they base [inaudible].  That
17 has not been forthcoming.  So we don't even know why they
18 received [inaudible].
19    We would suggest this is not a challenge to parole.  They
20 have made parole applications.  Those have been denied, and
21 that's in the discretion of the administrative authorities to
22 deny their parole requests.  But this is a different request
23 that they have made.  These are separate requests based on the
24 conditions that they are in and the policies and practices of
25 the respondents that keep those conditions in place.

And they have not received an adequate response to those to even know why they are being detained. And we believe that procedural due process requires that, and also the APA requires that because they must make a decision that is not arbitrary and capricious. They must, in other words, give reasons for their administrative action.

We've also made a claim under the Rehabilitation Act. And the Rehabilitation Act is a somewhat unusual use of that claim. You might note that in a case before the Western District, in the Abbott [inaudible] Texas Democratic Party, they raised a similar claim, the petitioners there, where they said that the inability to social distance and protect oneself from -- in the context of voting, to protect oneself from contracting COVID-19, that that constitutes a disability. And we believe that to be true.

We have argued, furthermore, that putting people in these conditions when they have not been able to exercise their rights [inaudible] under these conditions -- as we see, two of the petitioners have fled the country essentially or have been taken out of the country, out of their protest, because of the fact that they -- if they want to exercise their legal rights, they have to do so by submitting to living conditions and policies and practices that create those conditions that threaten their life and health.

We also have a claim based on international law. And that

1 claim, Your Honor, goes to the point that one of the key issues
2 in this matter is whether or not the health of the individuals
3 is being adequately responded to.  The right to health, I don't
4 think anybody will [inaudible] a right under international law,
5 and the Secretary of Health and Human Services back in 2012,
6 appearing before the World Health Assembly [inaudible], said
7 that the United States supports the right to health.  And they
8 have done so several times since then.

9     And we would suggest that that right, which is in the
10 constitution of more than half the countries in the world and
11 in the *American Declaration of the Rights and Duties of Man*, as
12 we point out in our amended petition, that that right is --
13 should include how we can [inaudible] this interest of health
14 that petitioners are claiming.

15     And if you combine that with our Fifth Amendment claim or
16 you consider their interest of health in relation to our
17 substantive due process Fifth Amendment claim, I think that --
18 and we have argued and we believe very strongly that this is
19 supported by international law, that there is a requirement
20 that the government keep them in conditions that would
21 significantly prevent them from contracting this deadly
22 disease.

23     And the government cannot do that because of their policies
24 and practices.  So we believe those policies and practices also
25 [inaudible] of the right to health and, by implication, right

1    to life under public international law.

2         In summary, Your Honor, those are the claims that the

3    petitioners have put forward and which we believe are not only

4    relevant in this case but have been upheld by courts in the

5    Fifth Circuit.  And we cited to the Velasquez -- *Vazquez*

6    *Barrera* case in the Southern District that, on very similar

7    facts, found that petitioners must be released if the policies

8    and practices of individuals -- of the respondents do not allow

9    them to adequately protect themselves from COVID-19.  It is a

10   deadly virus.

11        And we have cited to the *Dada-Witte* case from the Western

12   District of Louisiana in which they have thoroughly, in the

13   report and recommendation of the magistrate judge in that case,

14   which was then adopted by the federal court -- where they have

15   thoroughly gone through the understanding of what constitutes a

16   conditions claim and what constitutes a claim that goes to the

17   lawfulness of detention.  And I think -- and our claim clearly

18   falls within the [inaudible] they have understood to be a claim

19   against the lawfulness of detention.

20        And, Your Honor, I think that the basic issue, what is

21   fundamental to this, is understanding not only petitioners' --

22   I'm sorry -- respondents' policies and practices but also

23   petitioners' vulnerability because it is the combination of

24   those two that make these policies and practices inappropriate.

25        In other words, I think [inaudible] these policies and

practices might be appropriate for completely healthy individuals. But the individuals for whom we've brought this case, which is just a small fraction of the people that are in the detention of the respondents, these are individuals with serious vulnerabilities that the CDC has recognized make them vulnerable and more vulnerable to contracting [inaudible] suffering from COVID-19.

And there should be no mistake, and our expert I think can elaborate on this, even if you get COVID-19 and recover from it, you can have lasting, serious and -- medical and physical issues because of it. So the one client who has already contracted COVID-19 and suffered from that, he already may well have life-lasting, irreparable harm [inaudible].

But if I may, [inaudible] of our clients to communicate because there seems to be some confusion about this in relation to representations made by respondents in some of their motion [inaudible]. And if the Court will permit, I'll refer to them by their first name.

The first one, Maria, has PTSD. She has been diagnosed with PTSD. There's no mention of PTSD in respondent's motion to dismiss. PTSD is a neurological condition. We have provided the Court evidence in our amended petition that it is a neurological condition, and our two experts I believe will testify to that.

And I should note that our two experts have reviewed the

medical records of these individuals.  The experts that the respondents put forward in response to the -- our motion for a temporary restraining order was not a medical expert at all. There are some individuals with medical training that have looked at the means to support their motion to dismiss, but these have not, as far as we understand, reviewed their medical records [inaudible].

The second petitioner, Tomas, is diabetic, and he has -- he has not been provided a special diet despite repeated requests for that.  And changes to his medication have resulted in the improper management of his illness -- or have not resulted, I should say, in proper management of his illness.  So he is certainly a vulnerable person under the CDC guidelines.  He has diabetes.

Francisco, they claim is not a diabetic, but he is prediabetic, which means that he is right on the borderline. And to prevent him from becoming diabetic, he requires a special diet, which again he is not getting in these circumstances.  His special diet would perhaps help to protect him from contracting this disease and help to [inaudible] from falling into a situation where he certainly would have one of the CDC vulnerabilities, diabetes.

Marcos, who has -- not only has HIV but is also obese -- those are two very serious risk factors, and he contracted COVID-19.  So that is no longer speculative.  I think that

shows that our fear here is a very real fear because this
individual's in a very serious situation, has contracted
COVID-19. And even if he recovers, he would remain extremely
vulnerable to this disease and, if he got it again, would have
even a higher chance of dying from COVID-19.

Finally -- or not finally -- but Jorge, he has also been
diagnosed with PTSD, and he is obese. Obesity and PTSD are
both -- PTSD is a neurologic condition -- are both underlying
conditions.

And, finally, Andres Ponce Quintero, Andres, he is one of
the petitioners who is no longer in the country, but he has
HIV, another underlying vulnerability listed on the CDC's list,
that could cause him to contract the disease more easily and,
if he contracts it, to have serious consequences, even to die
from the disease.

THE COURT: Okay. So, Mr. Doebbler, what relief can
the Court give to the two individuals, the two petitioners who
have now left the country? If what you've pled and alleged is
that nothing less than release for each of these petitioners is
required, if they're no longer in custody, what's there left
for the Court to do?

MR. DOEBBLER: I think, Your Honor, in the case of
these two individuals, we believe a special remedy. And we
certainly recognize the Court's ability and discretion to
fashion whatever remedy it believes is necessary in this case.

And we believe, to effect their release appropriately, which
would allow them to adequately pursue their claim to protect
[inaudible] and to ensure that they are able to protect
themselves in doing so -- again, this last example of where
they're being asked to choose between living in a safe and
healthy environment or pursuing legal claims, we believe that,
if their release was ordered, that the respondents should bring
them back to this country and allow them to pursue their claims
within this country because that is what they have denied them
by either deporting them, which we don't know again, or by
encouraging them to leave by putting them into a -- in an
inhumane situation.

    We find it very unfortunate if any employee and
particularly a government would be in a position to put people
in such an inhumane situation that they decided to give up
claims that they have under the law and to leave the country to
find protections in countries, which I assume they are going
back to their home countries, where they fled initially from a
threat of persecution and inhumane degrees of treatment.

        THE COURT:  Okay.  So as to those two, I think -- and
please clarify me if I -- if I misstate your position when I
paraphrase it.  But as to those two, as I understand it, you're
requesting some sort of order, maybe a declaration, that if
they returned or were to return, they would be eligible for
release pending disposition of their immigration claims?

1    MR. DOEBBLER:  We think there -- if there was a

2  declaration declaring that their detention was unlawful, it

3  would be incumbent upon the government to return them to this

4  country and ensure that they are allowed to pursue their lawful

5  claims, whatever they are, in this case immigration claims, and

6  without being in custody, in a way that they can protect

7  themselves from the condition that they fear in detention.

8    THE COURT:  Okay.  So a declaration that their

9  detention's unlawful and concomitant requirement that the

10 government return them to the country to pursue those matters.

11 Okay.  So I think I understand now what you're requesting for

12 them.

13   All right.  Mr. Mueller, why don't I go back to you, give

14 you a chance to respond there as now -- we've now heard how

15 these claims are framed and how petitioners, in their view,

16 explain that they're not conditions of confinement claims.  Do

17 you have anything to say in reply to that?

18   MR. MUELLER:  Yes, Your Honor.  And I think you heard

19 Mr. Doebbler, in everyone of his claims, refer to the

20 conditions that they are being held under.  Pursuant to due

21 process, they argue that petitioners' conditions cannot be

22 [inaudible] punitive.  Once again, using the exact word that he

23 says he's avoiding, these conditions [inaudible].

24   As to the procedural and the APA, they made, you know,

25 these -- Mr. Doebbler asserted these are not conditions --

1  these are not parole requests, but they're separate requests

2  based on conditions and policies and procedures of [inaudible].

3  Once again, this ties right back into conditions of confinement

4  claims that they are making.

5      For the Rehabilitation Act he said that the inability to

6  protect and social distance [inaudible] living conditions that

7  he says are inhumane.  Once again, it ties right back into

8  conditions of confinement.

9      And as to international law, it's a requirement for

10  conditions that would allow protection from COVID-19.

11      So I think for every one of these claims, Mr. Doebbler has

12  articulated that there's conditions -- policies and procedures

13  are causing conditions and/or the conditions themselves that he

14  says are the basis for release.  And it does not [inaudible]

15  the authority to detain them, and that is not the creation of

16  the [inaudible].

17      As to the individuals that -- also as to international law,

18  there is not a waiver of sovereign immunity under that

19  particular [inaudible] pointed to, that -- when Congress has

20  waived sovereign immunity to allow suit under any of the

21  international laws that Mr. Doebbler cited.

22      The Rehabilitation Act, once again, has a jurisdictional

23  issue.  Rehabilitation Act is not appropriate [inaudible] and

24  does not have a remedy of release as a -- something -- and,

25  once again, the Rehabilitation Act allows for the -- for not

the release but for some supportive conditions to change or for

punitive measures, if there is even jurisdiction under the

Rehabilitation Act. And that's a labor code -- as you're

aware, that's a labor code decision. The Rehabilitation Act

does not waive sovereign immunity. The DHS regulations

regarding the Rehabilitation Act provide for an internal

complaint procedure to be made, which respondents have not

done, and they have not alleged that they have done it.

And multiple courts, as I've cited, have held that the

Rehabilitation Act does not apply to federal [inaudible].

And then I think that the reasonable accommodation, if they

were to sue under the Rehabilitation Act, if there was

jurisdiction under the Rehabilitation Act, certainly not a

habeas claim, then the -- it would be -- a reasonable

accommodation would have to be made, not the preferred

accommodation of release. I think that's how we also get

out -- on a substantive ground, out of the Rehabilitation Act,

if there is jurisdiction, if they have alleged a waiver of

sovereign immunity, which they haven't, under the

Rehabilitation Act.

And, finally, under the Rehabilitation Act, they have not

alleged they're being discriminated against because of their

disability. I think that's an important one. They're saying

that they're being treated the same as everybody else and that

there hasn't been an accommodation of their -- they haven't

alleged that, "This is the accommodation that needs to be made. We are being treated differently than everyone else." I that's one of the issues under the Rehabilitation Act as well.

I think the Rehabilitation Act is essentially a distraction. I think if that's something that if it were to be raised in conjunction with a civil rights law case seeking damages, there would still be jurisdictional claims, but that would be at least a more appropriate way to press these claims; that there are -- at the end of the day, they're all civil rights claims that he's brought under *Bivens*, if at all.

THE COURT: Okay. And let's just --

MR. MUELLER: [Inaudible].

THE COURT: Let's just stick there just for a second. So if these can be brought -- or if in your view these are civil rights sort of 1983/*Bivens* -- here it would be *Bivens* because it's federal detention. If that's the avenue, then is there -- obviously you can seek injunctive relief under *Bivens*. Is there -- is there a difference in what kind of claims can be brought seeking money damages versus what kind of claims can be brought seeking injunctive relief in terms of --

MR. MUELLER: Well, the defendants in a *Bivens* action would be different than defendants in a [inaudible]. So, fundamentally, a *Bivens* action is against individuals -- individual actions [inaudible] bases for a *Bivens* action.

THE COURT: They wouldn't -- they wouldn't be our

wardens that we have?  Who would the defendants be in a *Bivens*
action then if these petitioners were contemplating a *Bivens*
action, if you can -- I don't know if I can ask you that.  But
generally speaking.

MR. MUELLER:  It would be the people who took
individual actions as to the defendants.  I don't want to
speculate as to who those people may be.  I don't think that
would be appropriate for me in this case.  But I believe it
would be the individuals who took specific actions that the
petitioners can point to that either -- but, again, it goes
back to, what actions were taken?  Is it denial of medical
care, because there has been no denial of medical care.  In
fact, there's one petitioner who's gotten COVID-19 that has
received treatment, and he's still receiving treatment.  And
that -- so I don't see the claim.  I don't know what claims
would be brought under *Bivens*.  But it certainly is -- this is
not a situation where release is the only possibility, and
habeas really requires that [inaudible].

THE COURT:  Okay.  Mr. Doebbler, do you want to be
heard on that?

MR. DOEBBLER:  Yes, I would, Your Honor.

I think, as respondents indicated, the Department's counsel
indicates, he's indicated that we raised conditions in every
one of the claims.  We do that because conditions are, in fact,
evidence of policies and practices.  That is exactly what

1    happened -- what was argued and what the judge accepted in

2    *Dada-Witte*, is exactly what happened in *Vazquez Barrera*. They

3    argued that conditions are evidence of pervasive practices and

4    policy.

5       And the fact that he cites conditions in every instance

6    shows that it's not just an isolated incident that would maybe

7    give rise to one of these other claims, but that it is a

8    pervasive policy and practice. It is something that is being

9    done regularly. And that is, in this case, disadvantageous to

10    our petitioners.

11       As we said before, these type of policies and practices

12    might be adequate for people without vulnerabilities. We are

13    not asking for wholesale release of everybody in the detention

14    center. If these policies and practices do not cause

15    irreparable harm to the individuals, then they would not be

16    entitled to release. But we believe they do cause irreparable

17    harm to them because they increase the chance that they will

18    contract a deadly virus.

19       Moreover, I'd like to point out, even though I haven't --

20    there has been discussion in this hearing about other possible

21    forms of action, no other form of action would be able to

22    provide us the relief that we are seeking. Certainly, we

23    cannot bring a 1983 action because this is against a federal

24    employee, and I think we agree on that with counsel.

25       And they didn't explain, after a lawsuit, it would be

extremely difficult for us to bring –– and I would suggest, as
the Court said there, that unless it fits into a [inaudible]
*Bivens*, two categories that are available, it is not available.
And it would be very difficult for us to be able to fit it into
any of those categories.

The only conceivable play here would possibly be an FTCA
claim against the current respondents.  But an FTCA claim
would, first of all, be a claim for damages.  But we would have
to wait six months.  We cannot ask for equitable relief in an
expedited manner, we're trying to do here.

So we would be left without any remedy.  Our clients would
be put in a position where they are forced to live in a
situation where their life and well-being are threatened if
they want to exercise their rights under American law to be
able to claim some sort of protection from very dangerous
persecution and inhumane treatment abroad.  And there should
not be the situation, we believe, that they should be left
without any remedy for these rights and told, "Either choose
between your health and well-being and possibly your life and
the exercise of your rights that you have under United States
laws."

And, moreover, there are alternatives to this situation
that even respondents themselves have put forward, and which
they used in many situations.  These people could be released
in a manner that allowed them to appear before their

immigration proceeding with great security.  And there are
three points I'd like to make on that.

First, most individuals, detained or not detained, appear
before their immigration proceedings.

Secondly, as respondents pointed out, they could use an
ankle monitor.  They usually use check-ins.  These are means to
ensure that people appear.  And they work in practice.

And, finally, I think proof in the pudding is that one of
our clients, Maria, the lead client in this case, she actually
was prevented from appearing before her immigration
proceedings, and to her detriment, because she was detained.
So detention in that instance, in fact, did not promote the
goal of ensuring attendance at an immigration proceeding.  It
was contrary to that goal.

So I think that in this case there is no other alternative
except the action we have brought, because in part -- in large
part that is because the only way for individuals, the
petitioners in this case, to protect themself from the policies
and practices that have been put in place, that cause the
conditions that respondent rightfully refers to repeatedly,
that is release.  And that's why we used the habeas application
to try to protect the rights [inaudible].

THE COURT:  Okay.  Thank you.

Look, I think here's what -- here's what we ought to do.
Let's take a break.  Let's take a break till 11:00.  That's 20

minutes. I'm going to just take a look at a couple of things
and then sort of figure out what next steps are. And so we'll
take a break, come back, check in at 11:00 and, at that point,
figure out what we need to do sort of from here going forward.

So, if you can -- is everybody -- is everybody able to do
that? I think we can just sort of put things on hold or just
mute our lines for now until 11:00, and I can stop the
recording.

Does that present an issue for anybody on the call?

MR. DOEBBLER: Your Honor, I don't know if the two
expert witnesses that we have made available, whether they are
able, because they are practicing physicians and [inaudible] at
this time -- a busy time for physicians [inaudible] pandemic.
Maybe we could ask them if they would be available at that
time.

THE COURT: I can. The other -- the other thing I can
do is, I mean, if you're wanting to -- you're wanting to elicit
testimony from them. Do you anticipate how long that would
take, Mr. Doebbler?

MR. DOEBBLER: From our side I think it would take no
more than maybe 15 minutes or a half hour for each one at most.

THE COURT: Okay. For each one.

And the substance of the testimony would be what?

MR. DOEBBLER: It would be to go to the harm that we
are claiming, irreparable harm, and that our petitioners, we

believe, are suffering.

       THE COURT:  Okay.

       MR. DOEBBLER:  And I should let the Court know, of course, both of these experts have expert declarations on the record with the Court.

       THE COURT:  Okay.  I am actually fine not hearing from them.  But I don't want to -- I don't want to foreclose you from putting them on if you'd like to.  As you said, there's -- I have their declarations.  We also just, I think, have discussed at quite some length the nature of the harm that's alleged here and, you know, the extent of it.  So that's not -- that's not an issue about which I currently have a lot of questions.

   But if you want to make your -- make a record now at this proceeding, I won't stand in your way.  But I probably can't do that immediately.  So we can -- we could then ask them if they want to -- if they would be available at 11:00.

   What do you -- how do you feel about that, Mr. Doebbler? Do you really feel like you need to put them on, or are you comfortable taking a pass for now?

       MR. DOEBBLER:  I leave that really to the discretion of the Court.  And as the Court has indicated, if we go to the extent of the harm -- so if the Court would find it helpful, we would certainly be willing to put them on.  I think the Court thinks that that's repetitive of their declarations, we are --

1  [inaudible] discretion.

2        THE COURT:  Okay.  Well, I don't think it's necessary

3  today.  I think, if we need to hear from them, we can have them

4  back, or we could have them file additional declarations.  As I

5  said, that's a topic of -- a narrow slice of the topics of the

6  cases -- or the issues presented here that I feel pretty

7  comfortable with.

8     Mr. Mueller, obviously, does that present any problems for

9  you?  I guess, if Mr. Doebbler is okay with not putting them

10  on, then it doesn't really do much for you by way of

11  cross-examination.  But were you -- were you anticipating

12  needing to do that today, or are you okay just giving that a

13  pass?

14        MR. MUELLER:  No.  I'm fine [inaudible] them today.

15        THE COURT:  Okay.

16        MR. MUELLER:  But I [inaudible].

17        THE COURT:  Okay.  Well, then I'm okay with excusing

18  them, Mr. Doebbler, obviously without prejudice to calling them

19  in again if we need to.  So let's just -- let's go ahead and do

20  that, if you're comfortable with that.  And let's just check in

21  now at -- we'll call it five after 11:00.  Okay?  We'll see you

22  then.  Thanks.

23        MR. DOEBBLER:  Thank you, Your Honor.

24     *(Recess at 10:44 a.m. until 11:13 a.m.)*

25        THE COURT:  So we're back on the record in

1  SA:20-CV-00473-FB, Gaona versus U.S. Department of Homeland
2  Security, et al.  We just took a little bit of a break.  I've
3  had an opportunity to think about and digest what we discussed
4  this morning and also a further opportunity to digest all of
5  the briefing that I've read, excellent briefing in this case,
6  prior to -- prior to this hearing.
7      And so what I want to do now is just sort of talk about
8  where things go from here.  And what that means is, because
9  this matter's referred to me from Judge Biery, from the
10 district court, I have jurisdiction to issue a report and
11 recommendation.  That's what I'm going to do in these
12 circumstances.
13     With respect to the request for injunctive relief, I'm
14 going to recommend that that be denied.  I want to make clear
15 that the injury that's alleged here, I think there -- for me,
16 there is no doubt that it's serious and, as alleged, is
17 irreparable.  But where the injunctive relief claims fall short
18 for me is in the showing of likelihood of success on the -- on
19 the ultimate merits.
20     That dovetails with and matches up with my recommendation
21 on the motion to dismiss, which is going to be, as these claims
22 are currently pled, these are conditions of confinement claims
23 that are not cognizable in habeas or there otherwise isn't a
24 valid jurisdictional basis for these claims as they're
25 currently -- as they're currently pled and/or the claims are

barred based on the relief requested.  The claims are barred or
fail under Rule 12(b)(6).

So what I'm going to try to do then for you all is to give
you a report and recommendation that lays out those issues for
you.  You will obviously have an opportunity to take issue with
that with Judge Biery.  And I feel like that's the best way
that I can serve the interests of the case in getting you all
before the district judge as soon as possible.  So I'll hold
off on any discovery at this time based on that recommendation.
But should things change as objections are lodged or as the
case may or may not develop -- and, obviously, we can -- we can
revisit that.

I also want to recognize, well, first, just the excellence
of counsel and also, in particular, the plight that petitioners
find themselves in.  I'm not unsympathetic, not only to their
position but also to their legal position, which Mr. Doebbler
has explained on several occasions very ably in explaining how
it feels like there's sort of no pathway to relief.

I'm not sure there's necessarily no pathway to relief, but
it's an extremely difficult path if there is one.  And I
recognize that, and I'm sympathetic to that in this context.
But after having really looked over this very carefully and
having spoken to you all several times now and received, as I
said, a couple of rounds of outstanding briefing, those are my
determinations with respect to these claims.  And that's the

1  recommendation I'll go forward with with Judge Biery.

2      So it'll take some time for that written report and

3  recommendation to be drafted.  And, obviously, I would just

4  encourage you all to keep an eye on the case, to keep the Court

5  up to date if situations evolve or if there are new

6  developments.  But I'll be turning my full attention to getting

7  that report and recommendation on the docket and entered in the

8  case so that you all can -- you can move forward from there.

9  So that's the ruling of the Court.

10      Mr. Doebbler, is there anything else that we need to

11  address at this time, sir?

12          MR. DOEBBLER:  (No response).

13          THE COURT:  I think you're still on mute.

14          MR. DOEBBLER:  No, Your Honor.  I understand your

15  ruling, and we believe the Court has indicated that [inaudible]

16  a written ruling is going to be provided as soon as possible

17  because we realize that these considerations -- as you've

18  indicated, our clients are in very serious conditions of risk,

19  some type of relief for them we would like to try [inaudible]

20  sooner rather than later.  But we appreciate your [inaudible]

21  condition of that.  Thank you.

22          THE COURT:  Of course.

23      Mr. Mueller, anything from the government?

24          MR. MUELLER:  No, Your Honor.  I want to -- I'm not

25  unsympathetic to petitioners either.  [Inaudible].

1     THE COURT:  Okay.  That's appreciated as well.  And,

2  as I said, I really appreciated and enjoyed having you all in

3  court for -- even virtually for this case.  You just did a fine

4  job of advocacy.  This is a very tough case both in terms of

5  the facts in the situation presented and in terms of the law.

6  It's just a very complicated and tough area of law as well, I

7  think, for all of us.

8     Mr. Mueller, you will -- you promised that you'd file a

9  document with respect to the departure of one of the

10  petitioners.  Can I still count on you to get that on the

11  docket for us, just to make the record --

12     MR. MUELLER:  Yes, Your Honor.  Yeah.  I could -- I

13  will file it as an attachment to my latest filing where

14  [inaudible] Friday.  And so it'll be the [inaudible].

15     THE COURT:  Okay.  Thank you very much.

16     And then just, as I said before and as Mr. Doebbler has

17  stressed, I will turn to this and try to get this report and

18  recommendation before you all and before Judge Biery just

19  absolutely as soon as I can, you know, keeping in mind just

20  sort of the complexity of the issues.

21     So I thank you all again.  And, like I said, keep the Court

22  up to date if anything develops in the case.  Okay?  Thank you

23  all very much.

24     MR. DOEBBLER:  Thank you, Your Honor.

25     THE COURT:  The court will be in recess.

1    * * *

2      *(11:20 a.m.)*

3

4                          -oOo-

5     I, court approved transcriber, certify that the foregoing

6 is a correct transcript from the electronic sound recording of

7 the proceedings in the above-entitled matter.

8

9 Date:  10/20/2020   /s/ Chris Poage

10                       Approved Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25